## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

BRADLEY WILLIS INSLEY      *

Plaintiff      *

v      *      Civil Action No. ELH-16-1220

RICHARD J. GRAHAM, et al.      *

Defendants      *

       ***

### MEMORANDUM OPINION

Bradley Willis Insley, the self-represented plaintiff, is an inmate committed to the custody of the Maryland Division of Correction ("DOC") and confined at Western Correctional Institution ("WCI"). He has filed a civil rights action against Richard Graham, Jr., the Warden at WCI; Randy Watson, the Commissioner of Correctional (collectively, the "Correctional Defendants"); and "Wexford Inc.," alleging denial of adequate medical care. ECF 1. Insley has attached sixteen exhibits to his suit.

Wexford Health Sources, Inc. ("Wexford") and the Correctional Defendants have filed motions to dismiss or for summary judgment. ECF 13, Wexford; ECF 16, Correctional Defendants. Plaintiff opposes the motions (ECF 19; ECF 21) and defendants filed replies. ECF 22, Wexford; ECF 23, Correctional Defendants.

Also pending are plaintiff's motions to appoint counsel (ECF 18) and to amend the complaint. ECF 20.[1] Plaintiff states in his motion to appoint counsel that his claim has merit, is likely to require a trial, and will likely require discovery and access to experts, matters with which he is unfamiliar. ECF 18. A federal district court judge's power to appoint counsel under

---

[1] Plaintiff included affidavits and legal argument with these motions, which the court has considered in connection with the disposition of the case.

28 U.S.C. § 1915(e)(1) is a discretionary one, and may be considered where an indigent claimant presents exceptional circumstances.  *See Cook v. Bounds*, 518 F.2d 779, 780 (4th Cir. 1975); *see also Branch v. Cole*, 686 F.2d 264, 266 (5th Cir. 1982).  '

Upon careful consideration of the well-drafted motions and pleadings filed by plaintiff, the court finds that he has demonstrated the wherewithal either to articulate the legal and factual basis of his claims himself or secure meaningful assistance in doing so.  Moreover, no discovery is necessary, nor is a motion hearing necessary.  In short, there are no exceptional circumstances that would warrant the appointment of an attorney to represent plaintiff under §1915(e)(1). Therefore, the motion to appoint counsel (ECF 18) shall be denied.

Plaintiff's motion to amend the complaint seeks to correct the name of defendant "Wexford Inc." to its proper name, "Wexford Health Sources, Inc."  ECF 20.  The motion shall be granted and the Clerk will be directed to correct the docket accordingly.

No hearing is necessary to resolve the dispositive motions. *See* Local Rule 105.6 (D. Md. 2016).   For the reasons set forth below, defendants' motions, construed as motions for summary judgment, shall be granted and judgment shall be entered in their favor.

## I.        Plaintiff's allegations

Plaintiff began service of a 20 year sentence on April 19, 2004.  ECF 1 at 2.  When plaintiff began his sentence he was medically evaluated and determined to be infected with Hepatitis C ("HCV").  *Id.* at 3.  He claims he was denied treatment for HCV from 2004 through 2012 by medical care providers who told him that the DOC would not authorize treatment while he was asymptomatic.  *Id.*  He claims the disease was "allowed to develop unchecked" for eight years.  *Id.*

On April 17, 2012, plaintiff spoke with Ben Orteza, M.D., "of Wexford Inc.," and threatened to consult with an attorney regarding the denial of treatment for HCV. ECF 1 at 3.[2] Plaintiff asserts that at the time, he had access to information that contradicted the information he was being told regarding treatment. *Id*.

According to plaintiff, on October 25, 2012, Colin Ottey, M.D. ordered a blood test, which confirmed plaintiff's 2004 HCV diagnosis. *Id*. Soon after, on November 8, 2012, plaintiff participated in a video conference with Dr. Raphael. *Id*.[3] Plaintiff describes Dr. Raphael as a consultant for the DOC and Wexford. Raphael ordered a liver biopsy for plaintiff. *Id*. at 3 – 4. The biopsy took place on January 23, 2013, at Bon Secours Hospital and revealed "a final pathological diagnoses of chronic Hepatitis C with portal inflammation and lobular inflammation (Grade 1) with portal to portal septae (stage 2) determined to be genotype 1a with a viral load of 4,026,430." *Id*. at 4. Plaintiff states that the viral load is "high as compared to the reference range of between 0 – 614." *Id*.

Following plaintiff's biopsy, Dr. Raphael determined that plaintiff required treatment, which began in February of 2013. *Id*. At that time, plaintiff was treated with a combination therapy of "Pegasys (peginterferon alfa – 2a) and Ribavirin. . . ." *Id*. However, plaintiff claims that he was not provided with nutritional support while receiving the therapy; testing to determine his predisposition for favorable response; or additional medications to improve the efficacy of treatment. *Id*. Further, Insley states that the treatment regimen provided has an efficacy rate of 41 to 43% and claims that the failure to provide nutritional support contributed to the failure to achieve the desired response within 12 weeks of treatment. *Id*. As a result,

---

[2] All page citations refer to the electronic pagination as reflected on CM/ECF.

[3] It appears that the actual name is Dr. Daniel Wolde-Rufael. *See* ECF 13-6.

treatment was terminated in May of 2013 as required by the protocols established for this particular course of treatment.  *Id.*

According to plaintiff, he did not respond favorably to the treatment provided, which then required the use of  alternative treatments that were approved for use in the general population. ECF 1 at 4–5.  He claims he was denied access to any of those treatments and discovered on March 7, 2014, that no other treatment options are available within the DOC.  *Id.* at 5.  He asserts that withholding approved drugs for the treatment of HCV constitutes an Eighth Amendment violation.  *Id.*

Plaintiff filed a complaint with the Warden of WCI on April 6, 2014, through the Administrative Remedy Procedure ("ARP"), regarding further treatment for HCV.  ECF 1 at 5. On May 5, 2014, the ARP was dismissed with the explanation that there were no other treatment options approved for use in the DOC.  *Id.*  Plaintiff maintains that Warden Graham and his designee, Assistant Warden Denise Gelsinger, "failed to apply due process" to his ARP, failed to consider his rights, and exhibited deliberate indifference to his serious medical need.  *Id.*

On May 5, 2014, plaintiff filed with Commissioner of Correction Randy Watson an appeal as to the Warden's response to his ARP.  ECF 1 at 6.  According to plaintiff, Watson did not provide a timely response to the appeal, as required by applicable regulations, and he claims the failure to respond within the time required violated his right to due process and constituted deliberate indifference to his serious medical need.  *Id.*

Then, on July 29, 2014, plaintiff filed a complaint with the Inmate Grievance Office ("IGO") on July 29, 2014, regarding Watson's failure to respond in a timely manner and the

failure to provide him with alternative HCV treatment.  ECF 1 at 6.[4]  In anticipation of an IGO hearing, plaintiff requested documentary evidence and witnesses via a letter dated December 30, 2014.  *Id*.  The documentary evidence and witnesses requested were denied on January 23, 2015, by the IGO director at that time, Scott S. Oakley.  *Id*.  Plaintiff claims that Oakley's denial of the requested evidence violated his right to due process.  *Id*.

At an IGO hearing held on February 3, 2015, plaintiff asserted that the decisions of Wexford and the DOC to deny him access to other treatment options for HCV violated his rights as well as Division of Correction Directive ("DCD") 200-1.  ECF 1 at 6.  Plaintiff also asserted that the DOC's failure to consider his right to treatment was arbitrary and capricious and resulted in prejudice.  *Id*. at 7.   Administrative Law Judge ("ALJ") Jennifer Gresock ruled that plaintiff could not make the argument that the decisions regarding his treatment violated both DOC regulations and applicable laws, regulation, policy, and procedures.  *Id*.[5]  Plaintiff claims that the ALJ violated his due process rights in making such a ruling.  *Id*.

Following the IGO hearing, plaintiff's complaint was denied and dismissed by written decision issued on April 24, 2015.  ECF 1 at 7.  Plaintiff states that the ALJ "erroneously concluded that as a matter of law the decision of the [DOC] not to offer additional treatments for Hepatitis C after initial treatments were ineffective was not arbitrary and capricious or inconsistent with the law."  *Id*.

Plaintiff appealed the IGO decision by filing a petition for judicial review on May 4, 2015, in the Circuit Court for Allegany County, Maryland.  ECF 1 at 8.  He states that the

---

[4] The Administrative Law Judge noted in her decision that the grievance was filed on August 1, 2014. *See* ECF 1-15 at 1.  The discrepancy is not material.

[5] Plaintiff erroneously refers to the ALJ by the surname of "Cresock."  However, the ALJ indicates her surname is "Gresock."  *See* ECF 1-15.

Secretary of the Department of Public Safety and Correctional Services ("DPSCS"), the respondent in the state court proceeding, filed a motion for disposition without a hearing, which "intentionally and fraudulently misrepresented the law" regarding whether a hearing was required. *Id*. Plaintiff claims the motion misled the court into denying him due process, in violation of the Fourteenth Amendment, and denied him equal protection under the law. *Id*.

As relief, plaintiff seeks an order requiring the DOC and Wexford to provide treatment "comparable in quality to that available to the general population of the State." ECF 1 at 8. Further, he seeks compensatory and punitive damages for the deliberate delay and denial of the medical care sought as well as the denial of due process in the context of the administrative remedy process. *Id*. at 9.

## II.      Defendants' response

Wexford moves to dismiss or for summary judgment (ECF 13), supported by a memorandum and exhibits. Wexford provided a copy of the DPSCS's HCV treatment protocol (ECF 13-4); the Declaration of Sharon Baucom, M.D. (ECF 13-5); the Affidavit of Robustiano Barrera, M.D. (ECF 13-6); and plaintiff's medical records. ECF 13-7.

Baucom is the Executive Director of Clinical Services for DPSCS. *Id*. at p. 2. In her Declaration of January 26, 2015 (ECF 13-5), she explains the development and clinical application of the protocol for HCV infection control, as follows.[6]

In January 2012, DPSCS updated its existing policy, which was developed in 2007, to require enrollment of all persons in custody who tested positive for HCV in a chronic care clinic for purposes of monitoring the condition and providing patient education. ECF 13-5 at 2 – 3.

---

[6] Dr. Baucom's Delcaration was previously submitted as ECF 37-2 in a case before Judge Motz. *See French v. Corizon, Inc.*, JFM-14-2263 (D. Md.).

Prior to this change, only people seeking anti-viral treatment for HCV were enrolled in a chronic care clinic. *Id.*

Antiviral treatments for HCV are evaluated and considered by the DPSCS HCV Panel, comprised of Wexford Regional Medical Directors, Wexford statewide medical and mental health physicians, Wexford epidemiologists, Correct RX clinical pharmacologist, and Wexford infectious disease specialists. ECF 13-5 at 3. Dr. Baucom does not directly participate in panel decisions and states that her presence at panel meetings does not influence the decisions about the disposition regarding antiviral therapy. *Id.* In addition to the medical staff on the panel, DPSCS is represented by a registered nurse whose role is to insure that the panel adheres to mandated testing and vaccinations outlined in the DPSCS policy. *Id.*

Policies for the treatment of infectious diseases such as HCV are drafted for review by the DPSCS executive director of clinical services by researching the policies of other states, the Center for Disease Control (CDC), the Federal Bureau of Prisons, as well as community standard references. *Id.* at 3. Once the policy is drafted it is circulated, along with rationales for the recommendations for therapy, for comment among all of the contractor representatives. *Id.* Input provided is evaluated before a final draft is adopted and put into effect. *Id.*

Departure from the policy is available on a case-by-case basis and requests for departure are presented to Dr. Baucom by the Wexford infectious disease specialist consultant and Correct RX's Clinical Pharmacologist. ECF 13-5 at 3 – 4. Those exceptions are based on the inmate's condition and Dr. Baucom states she does not overrule the decision, but simply provides additional input or requests additional documentation to be added to the record. *Id.* at 4. As a member of the Pharmacy and Therapeutic Committee, Dr. Baucom assists in making the final decision for approval or denial of new HCV medications or treatments by following guidelines

formulated in the policy developed by the panel.  *Id.*  Additionally, she has the authority to request second opinions or considerations from other sources if they are not included as sources of treatment protocols.  *Id.*  Those sources include the policy on HCV therapy provided by the Maryland Department of Health and Mental Hygiene, the Veteran's Administration, or "a state similar in demographics regarding the correctional populations."  *Id.*

At the time Dr. Baucom provided her Declaration, the DPSCS had over 2000 known cases of inmates infected with HCV.  ECF 13-5 at 4.  Dr. Baucom states, ECF 13-5 at 5-6: "Within the past several months, the federal bureau of prisons developed a protocol specifically for the new HCV regimens that allows the most severely inflicted patients to be a priority group for treatment based upon several diagnostic principles."

New HCV medications are costly,[7] but Dr. Baucom states that DPSCS has met with pharmaceutical companies producing the drugs and is nearing completion of an update to the section of the policy regarding options for antiviral therapy related to the new medications.  *Id.* at 6.  Once a protocol decision is made regarding the new HCV antiviral medications, the Maryland Legislature must approve appropriate funding and resources so the treatment can be implemented.  *Id.*  Pending those prerequisites, the option to use the new medications is available on a case-by-case basis and may be prescribed by Wexford's infectious disease specialist.  *Id.*

Under the current DPSCS policy (ECF 13-5, "Medical Management of Hepatitis"), inmates who have any of the following conditions are not eligible for antiviral therapy but are monitored in a chronic care clinic:  those under the age of 18 or over the age of 62; those with a life expectancy of less than 10 years; those with a remaining incarceration time of less than 24 months for genotype 1; those who are co-infected with HIV for genotypes 2 and 3 . . ." and have

---

[7] *See* http://time.com/3654118/hepatitis-c-drug-harvoni-sovaldi-cvs/ (noting the cost of 12 weeks of treatment with Harvoni is $95,500 and  with Sovaldi is $84,000).

less than "12 months [to serve]; have a history of solid organ transplant; those who have a known, documented history of autoimmune disease; those who have a less than 80% compliance rate with any chronic care conditions, visits, and medication adherence; those who have a known, documented alcohol and/or illicit drug use within the previous 12 months; and those who are pregnant, have AIDS, decompensated liver disease, decompensated mental health condition with non-compliance with mental health medication or plan, or are diagnosed with an active Axis I, II, or III psychiatric diagnosis (must be approved by medical and psychiatric staff). ECF 13-4 at 4–5. If none of those conditions are present, the HCV infected inmate must undergo additional testing and the medical provider must document the results of those tests. *Id*. at 5. The inmate must be provided education regarding the disease and the antiviral treatment and an informed consent form must be signed. *Id*.

Of import, in a Declaration of July 19, 2016 (ECF 16-5), Dr. Baucom stated that on June 27, 2016, plaintiff was reevaluated regarding treatment for HCV and subsequently approved for treatment with Harvoni, one of the newer drugs for HCV treatment. ECF 16-5 at 9. Dr. Baucom avers that plaintiff "is currently receiving Harvoni as it was initiated June 30, 2016," following education by the clinical pharmacologist. *Id*.

Dr. Barrera is, among other things, the Medical Director at WCI. ECF 13-6, Barrera Aff., ¶ 1. In his Affidavit he provides additional information regarding HCV treatment and how it pertains to plaintiff's case in particular. ECF 13-6.[8] Dr. Barrera also verified the medical records submitted in support of Wexford's dispositive motion. *Id*. at 2.

---

[8] The signed copy of Dr. Barrera's Affidavit was mistakenly filed with the courtesy copy of defendant's motion; the copy filed electronically was not signed. ECF 13 at Ex. 3. At my direction, the signed copy was docketed at ECF 25. For consistency, reference to the Affidavit in this Memorandum Opinion will be to ECF 13-6.

Barrera describes plaintiff as a 60-year-old male with a chronic medical history significant for HCV, emphysema, diabetes mellitus, esophageal reflux, and hypertension. *Id.* at 3; *see also* ECF 13-7 (plaintiff's medical records).   He provides the following general information regarding screening of HCV inmates for treatment pursuant to the DPSCS protocol in place.

Inmates eligible for antiviral treatment are given various laboratory blood tests and given a consultation with a gastrointestinal or infectious disease specialist when being considered for a liver biopsy or antiviral therapy.  ECF 13-5 at 3.  Inmates with HCV genotype 2 or 3, and those who are co-infected with HIV, are not required to have a liver biopsy before receiving antiviral treatment. *Id.* All other HCV positive inmates, including plaintiff, who have genotype 1, require a liver biopsy as a condition precedent to antiviral treatment. *Id., see* ECF 13-7 at 15 – 16. "The purpose of the liver biopsy is to determine the status of the inmate's HCV infection and obtain clinical information essential to developing the appropriate treatment plan." ECF 13-6 at 3.

According to Barrera, antiviral treatment is not medically necessary until it is determined that an inmate's HCV infection has progressed to a certain stage.  ECF 13-6 at 3.  Under the policy, HCV infected inmates who have not progressed to the stage where antiviral treatment is necessary are monitored in a chronic care clinic. *Id*.  "Members of the general population can be positive for HCV, and in particular those with genotype 1 HCV, without knowing it and without manifesting any adverse symptoms." *Id.*  Barrera states that patients positive for HCV "may continue for years, if not indefinitely, without manifesting adverse symptoms." *Id.* at 4.  Barrera explains that when the condition reaches an acute stage, possible symptoms include a general feeling of tiredness, loss of appetite, nausea, vomiting, diarrhea, muscle aches and abdominal

discomfort.  *Id.*  Plaintiff did not exhibit those symptoms.  *See* ECF 13-7 at 18 (listing pertinent negatives); at 76 (describing plaintiff as asymptomatic); and at 112 (noting HCV is stable).

For HCV genotype 1 infections, which is the type of HCV that plaintiff has (*see* ECF 13-7 at 23), Barrera states that the potential side effects along with the cost of antiviral therapy is contraindicated where the sole basis for treatment is a positive test for HCV.  ECF 13-6 at 4. Once the liver biopsy is performed, the results are reviewed by the DPSCS HCV panel, which is currently led by Dr. Daniel Wolde-Rufael, an infectious disease specialist at the University of Maryland Medical System.  *Id.*  The panel approves antiviral therapy if "a) the biopsy indicates the patient is at a stage of infection warranting antiviral therapy; b) [the panel] approves going forward with a specific antiviral therapy regimen; and c) [the panel] establishes the prioritization of the therapy."  *Id.*  Barrera explains that antiviral treatment has two goals: "to achieve sustained eradication of HCV . . . defined as the persistent absence of HCV RNA in serum six months or more after completing treatment . . . and to prevent progression to cirrhosis, hepatacellular carcinoma, and decompensated liver disease requiring a liver transplant."  *Id.*

Barrera avers that plaintiff was asymptomatic for years after his admission to the DPSCS system and was not a candidate for antiviral therapy.  ECF 13-6 at 4–5.  When plaintiff's blood work revealed an elevated viral load in October 2012 and his January 2013 liver biopsy result revealed a clinical condition that warranted antiviral treatment, that treatment was approved.  *Id.* at 5; *see also* ECF 13-7 at 10 – 11; 21; and 26 - 32.  The treatment approved for plaintiff was Pegylated Interferon, a "long-acting interferon that can be given once a week," and Ribavirin, an oral antiviral medication given twice a day.  ECF 13-6 at 5; *see also* ECF 13-7 at 38 – 39. Plaintiff received this treatment in 2013, but the treatment was terminated because he was not responding to it.  ECF 13-6 at 5; ECF 13-7 at 67.  No other antiviral treatment therapies were

"generally approved by DPSCS" until 2015.  ECF 13-6 at 5. Treatments, including Harvoni, were approved for inmates by the DPSCS HCV panel as of 2012, but only on a case-by-case basis. *Id*.

In 2015 other antiviral treatments were "more available and the DPSCS HCV panel has been systematically treating inmates with more advanced grade and stage levels of HCV and working down to less advanced grade and stage levels." ECF 13-6 at 5.  Barrera explains that grades of necrosis or inflammation are designated as G1 through G4, with G1 signifying minimal inflammation, G2 is mild, G3 is moderate, and G4 is severe.  *Id*.  Staging of the disease is similarly classified, with S1 signifying no scarring, S2 is mild scarring, S3 is moderate scarring, and S4 is severe scarring or cirrhosis.  *Id*.  Plaintiff's condition, following his treatment with the initial antiviral therapy, is G1 (minimal inflammation), S2 (mild scarring).  *Id*.  Patients whose disease is at Stage 2 were approved for treatments alternative to Pegylated Interferon/Ribavirin in the Spring of 2016 under the protocol.  *Id*.

Barrera explains that HCV treatment plans require evaluation and approval by psychiatry because a diagnosis of HCV can prompt mood changes that include anxiety and irritability which are also possible side effects of HCV treatment.  ECF 13-6 at 5 – 6.  Additionally, some of the older treatments for HCV can exacerbate depression, anxiety, and irritability.  *Id*. at 6.  The purpose of the psychiatric evaluation is to determine if the patient is in a stable condition and to obtain a psychiatric baseline.  *Id*.

Also required as part of the treatment protocol is a vaccine for Hepatitis A and B as a precautionary measure for all inmates testing positive for HCV.  ECF 13-6 at 6.  The vaccine, Twinrix, is given in a series of three injections and provides active immunity against Hepatitis A and B.  *Id*.  Plaintiff was provided with these vaccines.  ECF 13-7 at 22.

Further, Barrera explains that "viral load" is a measurement of the RNA virus, which is the building block of HCV, in the blood.  ECF 13-6 at 6.  A person is considered HCV positive when a blood test reveals he has "anti-HCV antibodies in the blood."  *Id*.  The presence of those antibodies indicates the person has been exposed to the Hepatitis C virus.  *Id*.  It is possible to be "antibody positive" and have no "measurable viral load," which may mean the person may be part of the "20% of people who naturally clear the virus from their bodies."  *Id*.  Alternatively, the blood test may have been drawn at a time when the virus was "temporarily undetectable" as "HCV viral load in the blood goes up and down."  *Id*.  Thus, a second test is required before a doctor reports a negative viral load.  *Id*.  Once someone is infected with HCV, he will keep the antibodies for the virus, but if he has "no detectable HCV viral load, that indicates recovery from infection," defined as a response to treatment and sustained remission.  *Id*.  Remission is established where a later viral load test comes back with undetectable viral load, defined as a viral load below 800,000 IU/ml.  *Id*. at 7 – 8.

Richard Graham, Warden, and Randy Watson, former Assistant Commissioner of Programs Services for DPSCS,[9] assert that they rely on the medical judgment of the private medical contractor, Wexford, for decisions regarding medical care for inmates.  ECF 16-2 (Decl. of Graham); ECF 16-4 (Decl. of Watson).  Neither Graham nor Watson had the authority to order Wexford to provide particular medical procedures or treatment to an inmate.  *Id*.

With respect to plaintiff's assertions regarding the responses to his ARP complaint, Graham states he did not sign the ARP response provided to plaintiff (designated as WCI ARP 0563-14).  Rather, it was signed by his designee.  ECF 16-2 at 1.  Graham explains that when he is out of the institution he gives the Assistant Warden authority to sign specific documents in

---

[9] Watson became the Assistant Commissioner of the Western Region of the DPSCS in April of 2015 and retired in November of 2015.  ECF 16-4.

order to keep the work flow running smoothly.  *Id*.  Watson states that when an ARP concerning medical care reaches the Commissioner of Correction and is provided to him as the designee for a response, Watson and his staff rely on the reports, assessments, and judgments of trained medical staff to prepare the response.  ECF 16-4.

Plaintiff's ARP (WCI ARP 0563-14) was investigated at the institutional level by two registered nurses, Kim Martin and Rebecca Leatherman, both Wexford employees.  ECF 16-5 at 9.  The ARP appeal to the Commissioner of Correction was investigated by Pamela Knable, R.N., who is employed by the DPSCS.  *Id*.  Dr. Sharon Baucom, who provided a Declaration in support of the Correctional Defendants' motion, was consulted regarding the investigation as well as the recommended responses to the ARP.  *Id*.

### III.    Standard of Review

Defendants' motions are styled as  motions to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.  A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cty*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).  Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss."  *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).  However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).  If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Md*., _____ Fed. App'x _____, No. 15-2589, slip op. at 7 (4th Cir. Nov. 29, 2016) (per curiam).  When the movant expressly captions its

motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that  conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Adams Housing, LLC, supra*, slip op. at 7 ("The court must give notice to ensure that the party is aware that it must come forward with all of [its] evidence . . . .")  (Citation omitted).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id*. at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id*. at 165, 167.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2012); *see Putney v. Likin*, ____ Fed. App'x ____, 2016 WL 3755783, at *5-6 (4th Cir. July 14, 2016); *McCray v. Maryland Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2015). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

16

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods,* 302 F.3d at 244 (citations omitted). But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted). According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244-45 (internal citations omitted); *see also Putney*, 2016 WL 3755783, at *5; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008).

According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary," and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Harrods,* 302 F.3d at 244-45 (internal citations omitted). Moreover, "[t]his is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 2016 WL 3755783, at *5.

Plaintiff filed an affidavit indicating his need to "complete discovery" of various Division of Correction Directives to establish the manner in which medical care is expected to be

17

provided within the prison and his need to depose the opposing parties as well as other unnamed officials.  ECF 21-3.  As explained more fully below, the stated purpose for introduction of evidence that purports to set operational standards in a broad sense does not serve to establish the existence of a constitutional violation.  Even assuming those directives were violated, that factor alone does not mean plaintiff's constitutional rights were denied. *See Riccio v. Fairfax*, 907 F.2d 1459, 1466 (4th Cir. 1990) ("a state does not necessarily violate the constitution every time it violates one of its rules."); *Ewell v. Murray*, 813 F. Supp. 1180, 1183 (W.D. Va. 1993) ("Even if state law creates a liberty interest, violations of due process are to be measured against a federal standard of what process is due.").  In addition, plaintiff's reference to the need to depose opposing parties, without more, does not establish a basis for discovery pursuant to Fed. R. Civ. Proc. 56(d).  Plaintiff's request for discovery will be denied and defendants' motions will be addressed as motions for summary judgment.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion.  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club,*

*Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Moreover, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black &. Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.

Nevertheless, to defeat summary judgment, conflicting evidence, if any, must give rise to a *genuine* dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id.* at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Id.* at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation v. Catrett*, 477 U.S. 317, 323–24 (1986)).

## IV.   Discussion

### A.  Eighth Amendment Claim

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *Scinto v. Stansberry*, ____ F. 3d ____, 2016 WL 6543368, at *1 (4th Cir. Nov. 4, 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016).  In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need.  *See Estelle v. Gamble*, 429 U.S. at 106; *see also Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available.  *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  Objectively, the medical condition at issue must be serious.  *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care);

*Scinto*, 2016 WL 6543368 at *1.   A "'serious . . . medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan,* 196 F.3d 839, 846 (7th Cir. 1999)); *see Scinto*, 2016 WL 6543368, at *1.

Proof of an objectively serious medical condition, however, does not end the inquiry. The subjective component requires a determination as to whether the defendant acted with "a sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *see Farmer*, 511 U.S. at 839-40; *Scinto*, *supra*, at *2.   As the *King* Court recently reiterated, 825 F. 3d at 219: "The requisite state of mind is . . . 'one of deliberate indifference to inmate health or safety.'" (citation omitted).   Although this "'entails more than mere negligence . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Id.* (quoting *Farmer*, 511 U.S. at 835).

However, in order "[t]o show an Eighth Amendment violation, it is not enough that an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Lightsey*, 775 F.3d at 178.   In other words, deliberate indifference requires a showing that the defendant disregarded a substantial risk of harm to the prisoner. *Young v. City of Mt. Ranier*, 238 F.3d 567, 575-76 (4th Cir. 2001).

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839-40.   "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997).   As the *Farmer* Court explained, reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate

health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U. S. at 837.   Thus, "[a]ctual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'"   *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).   But, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk, no matter how obvious."   *Brice*, 58 F.3d at 105.

The Fourth Circuit has characterized the applicable standard as an "exacting" one. *Lightsey*, 775 F.3d at 178.   Deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness, and as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Id.*; *see also Scinto*, *supra*, at *2; *Grayson v. Peed*, 195 F.3d 692, 695- 96 (4th Cir. 1999) ("Deliberate indifference is a very high standard – a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences . . . To lower this threshold would thrust federal courts into the daily practices of local police departments.").   Therefore, mere negligence or malpractice does not rise to a constitutional level.   *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986) (citing *Estelle v. Gamble, supra,* 429 U.S. at 106).   Moreover, in a case involving a claim of deliberate indifference to a serious medical need, the inmate must show a "significant injury."   *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014).

A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842). In *Scinto*, *supra*, at *2, the Fourth Circuit said:

> A plaintiff also makes out a prima facie case of deliberate indifference when he demonstrates "that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official . . . had been exposed to information concerning the risk and thus must have known about it . . . ." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (first alteration in original) (internal quotation marks omitted) (quoting *Farmer*, 511 U.S. at 842). Similarly, a prison official's "[f]ailure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs." *Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837. However, even officials who acted with deliberate indifference may be "free from liability if they responded reasonably to the risk." *Farmer*, 511 U.S. at 844.

Even if the requisite subjective knowledge is established, however, an official may still avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000 (citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

With regard to medical care providers, "any negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir. 1998). Without evidence that a doctor linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge required for Eighth Amendment liability is not present. *Id*. at 169 (actions

inconsistent with an effort to hide a serious medical condition, refutes presence of doctor's subjective knowledge). In essence, the treatment rendered must be so grossly incompetent or inadequate as to shock the conscience or to be intolerable to fundamental fairness. *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citation omitted) (*overruled in part on other grounds by Farmer,* 511 U.S. at 837; *aff'd in pertinent part by Sharpe v. S.C. Dep't of Corr.,* 621 Fed. Appx. 732 (Mem) (4th Cir. 2015). And, the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable.*" *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir. 1977) (emphasis added).

Here, it is undisputed that plaintiff is HCV positive and that his status was known at the time he began his sentence in 2004. It is also undisputed that plaintiff is now receiving Harvoni as a treatment for HCV. *See* ECF 21-3 at 1. Although plaintiff alleges his condition was allowed to develop unchecked for eight years, he does not dispute that his condition was monitored in a chronic care clinic, nor does he describe worsening symptoms indicative of advanced stages of HCV. Rather, plaintiff takes the position that once the first antiviral therapy proved ineffective for him, he was entitled to treatment with another, possibly more effective treatment, because those treatments were available to the general public at that time. Plaintiff relies on a policy statement regarding inmate healthcare to support his entitlement to care available to the general public. *See* ECF 1 at 6 – 7; ECF 19 at 16 (citing Division of Correction Directive (DCD) 200-1).

Specifically, DCD 200-1(V)(D) provides:

Policy: Inmates committed to and confined in the Division of Correction have the following rights:

* * *

    D. Health care services comparable in quality to those available to the general population of the State, including:

1. An assessment of health needs and general conditions of the inmates at admission,
2. A thorough physical examination,
3. Access to medical and dental services provided by persons with appropriate training and under the supervision of a licensed physician or dentist,
4. Availability of emergency medical and dental treatment on a 24-hour basis,
5. Access to a licensed medical facility, and
6. Access to trained mental health personnel.

*See* ECF 1-16 at 45 – 46 (DCD 200-1).

The remaining enumerated portions of the policy section of the directive set forth standards for other aspects of basic daily living within the prisons such as provision of adequate nutrition; sufficient clothing; adequate toilet, bathing and bedding facilities; adequate personal hygiene supplies, safety and security within the institution; and equal access to programs and services without regard to race, religion, national origin, sex, disability, or political beliefs. *Id.* The aspects of health care enumerated in the section cited by plaintiff were in fact provided in this case. The directive's reference to care available to the general public is not a guarantee that inmates will be provided care on demand without regard to medical need or cost effectiveness.

In addition to providing constitutionally adequate medical care, prison officials and medical care providers contracted with the State are charged with the responsible distribution of resources. Where, as here, medically trained professionals have assessed the prisoner's medical condition and determined that costly resources, such as Harvoni, are not urgently required, but are in fact required by those who are more ill, deliberate indifference is not the cause for the delay in treatment. Rather, the delay in treatment is occasioned by a careful consideration of how best to treat the prison population without expending public funds irresponsibly. The delay

involved in plaintiff's case did not inflict needless pain and suffering, nor has it resulted in a permanent injury to plaintiff.

In short, there is no evidence that Wexford exhibited a reckless disregard for plaintiff's serious medical condition.  Wexford is entitled to summary judgment in its favor on the Eighth Amendment claim.

Graham and Watson were supervisory defendants.  They are not liable under 42 U.S.C. §1983 unless there is evidence that "(1) the supervisory defendants failed promptly to provide an inmate with needed medical care, (2) that the supervisory defendants deliberately interfered with the prison doctors' performance, or (3) that the supervisory defendants tacitly authorized or were indifferent to the prison physicians' constitutional violations."  *Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990) (internal citations omitted) *abrogated on other grounds*; *see also Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984) (supervisory liability for an inmate's beating by prison guards).

The record is devoid of such evidence.  To the contrary, it shows that they had no authority or responsibility for Wexford's medical care.  Therefore, they are entitled to summary judgment.

## B.  Fourteenth Amendment Claim

Plaintiff's due process claim is less clear, but appears to be based on the manner in which his administrative remedies were handled and his purported right to medical care under prison regulations.  ECF 1.  Due process protections apply when a protected liberty or property interest exists and require certain procedural protections to take place before the protected interest is removed.

In the prison context there are two different types of constitutionally protected liberty interests which may be created by government action.  The first is created when there is a state created entitlement to an early release from incarceration.  *See Bd. of Pardons v. Allen*, 482 U. S. 369, 381 (1987) (state created liberty interest in parole); *Wolff v. McDonnell*, 418 U. S. 539, 557 (1974) (state created liberty interest in good conduct credits).  The second type of liberty interest is created by the imposition of an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sandin v. Conner*, 515 U. S. 472, 484 (1995).

To the extent that plaintiff relies on DCD 200-1(V)(D), or similar state regulation, as the basis for a state-created liberty interest in receiving medical care of his choice, his reliance is misplaced.  *See* ECF 20-1 at 6.  As the Supreme Court observed in *Sandin*, 515 U.S. at 483 – 84 (citations omitted):

> States may under certain circumstances create liberty interests which are protected by the Due Process Clause. . . . But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Claus of its own force . . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

Policy statements regarding the general quality of health care to be provided to inmates is not such a regulation.  A delay in providing medical care that is otherwise accessible to the general public[10] does not impose an atypical and significant hardship giving rise to a protected liberty interest when there is no serious medical need requiring that medical care.  Unqualified access to health care is not within the purview of the ordinary incidents of prison life.  *See Hudson v. McMillian*, 503 U.S. at 9 ("society does not expect that prisoners will have

---

[10] The phrase "available to the general public" is  arguably vague and would present an unworkable standard to determine if a prisoner is entitled the care in question.

unqualified access to health care").  Thus, the delay involved in plaintiff's case did not violate his due process rights.

To the extent that plaintiff's due process claim is a challenge to the validity of the responses provided to his ARP or the outcome of the appeals process, further appellate review of the matters raised in those proceedings is not available in this court.  "Under the *Rooker-Feldman*[11] [abstention] doctrine, a 'party losing in state court is barred from seeking what in substance would be appellate review of the state judgment in a United States district court.'"  *Am. Reliable Ins. v. Stillwell*, 336 F.3d 311, 316 (4th Cir. 2003) (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1005-06 (1994)).  Plaintiff's assertions that improper standards were applied for purposes of dismissing his administrative complaint and the appeal thereafter (*see* ECF 18-1 at 7–9, "Memorandum in Support of Motion for Appointment of Counsel") are a matter appropriately addressed with the Maryland appellate courts.  The due process claim fails.

## V.    Conclusion

The record evidence, which is largely undisputed, establishes that plaintiff's constitutional right to adequate medical care for a serious medical need was not violated by the delay in providing him with alternative antiviral treatment for HCV.  The actions taken by defendants did not exhibit a deliberate indifference to a serious medical need, nor did defendants deprive plaintiff of his right to due process.  Defendants are entitled to summary judgment in their favor.

---

[11] *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482, (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 416 (1923).

A separate Order follows, implementing this Memorandum Opinion.


December 8, 2016                    _____/s/_____
Date                               Ellen L. Hollander
                                   United States District Judge